## Chicago & A. R. R. Co. v. Jane Hardie, Adm'x.

1. RAILROADS—*Flagman at Crossings—Res Gestae.*—In actions for personal injuries, it is proper to show the exact condition of things at the crossing when the injury occurred, including the fact that no flagman was stationed there; not to establish negligence in not keeping a flagman, but to enable the jury to determine what precautions due care required of the trainmen when backing a train upon the crossing.

**Action in Case.**—Death from negligent act. Appeal from the Circuit Court of La Salle County; the Hon. CHARLES BLANCHARD, Judge, presiding. Heard in this court at the May term, 1899. Reversed and remanded. Mr. Justice DIBELL dissenting. Opinion filed October 12, 1899.

GEORGE S. HOUSE and ARTHUR H. SHAY, attorneys for appellant.

H. H. DICUS and McDOUGALL & CHAPMAN, attorneys for appellee.

MR. JUSTICE HIGBEE delivered the opinion of the court.

This was a suit instituted by appellee against appellant and the Streator Railway Company, to recover damages suffered by her by reason of the death of her husband, Thomas Hardie, alleged to have been caused by the negligence of appellant and said Streator Railway Company.

In the summer of 1895, the Streator Railway Company was operating an electric street railway system in Streator, a city of ten to fifteen thousand inhabitants. One of their tracks extended along Hickory street, which runs east and west, and is one of the most traveled streets in the city. The cars running upon said street railway were each operated by one man, who acted both as motorman and conductor. By the rules of the company this motorman was permitted, where the street car track was straight, to go back into the car and collect the fare from the passengers while his car was running, but if the place where the car was then running was at all dangerous he was required to stop his car before proceeding to collect fares.

The rules of the company also required that in approaching a railroad crossing the motorman should bring his car to a full stop, at least twenty feet before the crossing, and should not then proceed until he had ascertained that it was safe for him to cross.   The street car tracks crossed the line of three different railroads in the city.   At the same time appellant operated a steam railroad passing though the city of Streator.   In going through the city, appellant crosses Hickory street with three tracks—a main track, a passing track and a switch track—the main track being north of the other two.   Appellant's tracks cross Hickory street at an angle running from the southeast to the northwest, and the main track preserves this same course for some distance on either side of said street.   Everett street, running north and south, crosses Hickory street at right angles just west of the point where the former street is crossed by appellant's tracks, so that the railroad tracks pass almost immediately from Hickory street to Everett street.   Wason street is the next street west, and parallel to Everett street, and appellant's depot is located on the north side of its main track, about midway between Everett street and Wason street.   The depot platform is raised about two feet above the rail of the track, and extends from a point northwest of the depot down the track, in a southeasterly direction to the sidewalk, running north and south on the west side of Everett street.

On the 8th day of July, and for some time prior thereto, appellant ran a regular local freight train, which also carried a car for the accommodation of passengers, from Dwight to Washington, in this State, passing through Streator on each week day.   The crew of this train was accustomed, after the arrival of the train, to do what switching work there was to be done at the Streator station.   On the morning of said day, this train carried for the accommodation of passengers, an old passenger coach or combination car, the space in front being partitioned off for baggage and express matter and the remainder of the car provided with seats for passengers in the manner of an

ordinary passenger coach. The train arrived at Streator at about 8:40 A. M., where it remained something over two hours, while the train crew was doing the necessary switching. During this time an engine and crew of the C., B. & Q. R. R. Co. switched six coal cars from the tracks of the latter road onto appellant's main track, for the purpose of being delivered by appellant to the Acme coal shaft, situated about half a mile southeast of appellant's depot. When appellant's engine and train crew had finished the switching work, the engine, with two freight cars which had been uncoupled with the engine from the train when it arrived, and were still coupled together, backed upon the main track and were coupled to the six coal cars. The engine and the eight cars attached to it were then backed further down the main track and coupled onto the cars standing there. The train then started to back down the track toward the southeast to the coal shaft, to set out the coal cars. As the train started back, a street car was coming west on Hickory street toward the crossing, on which were one Mallory, the motorman and conductor, and three passengers, one of whom was Thomas Hardie, appellee's intestate. The car was running at its usual speed, and Mallory, the motorman, was in the body of the car, standing with his back toward the railroad crossing, apparently collecting the fares from the passengers. When the street car was discovered approaching, the conductor of appellant's train, and several passengers, endeavored to attract Mallory's attention to his danger by shouting to him, and the conductor also signaled the engineer to stop. The engineer, however, did not bring the train to a stop until the passenger car, or the larger part of it, had run over the street car track. The motorman did not catch the warning given him until his car had reached a point within twenty-five or thirty feet of appellant's track, when he hurried to the front platform of his car and grasped the brake handle and power lever, but was unable to stop the car in time to avoid a collision. By reason of the collision, said Hardie was thrown from the car in which he was riding and received

injuries which shortly afterward resulted in his death. Appellee, having been appointed administratrix of her husband's estate, brought this suit. After all the evidence was in, appellee dismissed her suit as to the Streator Railway Company, and the jury returned a verdict against appellant for the sum of $5,000, and a motion for a new trial having been overruled, the court entered judgment for the amount of the verdict.

It is claimed by appellant that the verdict in this case was not sustained by the evidence, and the argument of counsel on both sides is mainly directed to that question. That the motorman of the street car company was guilty of the most inexcusable negligence was not questioned on the trial. Appellant, however, insists that it was not guilty of the negligence charged to it in the declaration, and that, even if it were so guilty, such negligence was not the proximate cause of the injury complained of. It can not be questioned that appellant had the right to move its cars up and down the track, across Hickory street, using due care to avoid accident, but appellee claims that the passenger car, with one car attached to it, had been detached from the train soon after its arrival, and left standing immediately north of Hickory street, during the time the switching was being done, and that when the engine and cars attached to it were backed down to couple onto them, the passenger car and the freight car attached to it were "kicked" violently and rapidly back over the crossing, causing the collision. It therefore becomes important to know the condition of the train after it arrived in Streator, up to the time of the collision.

Appellee introduced witnesses Harvey and Donaghue, who testified that they passed the railroad crossing on Hickory street twice that morning and noticed the caboose, or passenger car, standing close to the sidewalk on the north line of Hickory street, the latter witness stating that he thought there was one freight car attached to it; also the witnesses, Fred Schlageter, who was in his office in his planing mill, some 150 feet away, and Philip Schlageter, who was unloading lumber near by, both of whom testified to a similar state of facts.

Witness Harvey also testified that when the engine with the cars attached to it was backed down to make the coupling he heard the cars strike, and saw the brakeman jump off to make the coupling, but that they were going so fast the brakeman could not make the coupling. Fred Schlageter also swore that the freight train came down rapidly to make the coupling, and that he "heard them bump together pretty hard." Witness Ritchie testified for appellee that just after the accident, there was one car attached to the caboose, and that soon afterward the train coupled together and pulled away toward the north. On the other hand the conductor, Leighton, testified that in coming into Streator, the train passed over Hickory street and drew up in front of the depot, on the main track next to the depot platform, with the caboose west of the sidewalk running north and south on the west side of Everett street; that the train, as thus stopped, blocked the Wason street crossing, and that to clear this crossing the train was cut between the second and third cars back from the engine; that this being done the engine, with two freight cars attached, moved further on and proceeded to do such switching work as was necessary, leaving the rest of the train standing as above described, and coupled together during all the time the switching was going on; that immediately after the occurrence of the collision, he directed the rear brakeman to cut the train at the crossing.

These statements of the conductor are corroborated by the testimony of Freed, a brakeman, Wilkinson, the engineer, and Reeder, the fireman of the train, and Campbell, the station agent. In addition to the above witnesses, who were all employes, Lawler, the expressman on the train, who was not one of its employes, says that the train stopped near the depot so as to allow the caboose car to just clear the Everett street crossing, and that this brought the caboose car alongside the depot platform, where said car remained coupled to ten or twelve freight cars during the time in question.

Brady, a passenger, testified the caboose car was along

down toward the end of the depot platform.    Kern, a pas-
senger, said that the caboose was standing at the southeast
end of the platform, just north of the street crossing.
Marks, O. W. H. Taylor and Leroy P. Taylor, all passen-
gers, testified that they got into the caboose from the depot
platform, and the latter testified that when he entered the
caboose it was coupled to the main part of the train.

The overwhelming weight of the testimony, therefore,
is that the caboose was left standing by the depot platform
west of Everett street, and that during all the time the
switching was being done it was coupled to some ten to
twelve freight cars standing in front of it.    Such being the
fact, the caboose and one freight car attached to it could
not have been "kicked" back over the crossing, as claimed
by appellee.    Nearly all the witnesses for appellant above
mentioned also testified that when the two sections of the
train were coupled together there was no movement of the
caboose car.

It also appears from the evidence that when the street
car came in sight it was seen by the conductor, and that he
immediately signaled his engineer to stop, and shouted to
the motorman to warn him of his danger, and that he was
joined in the latter by several of the passengers.    There is
some controversy in the evidence as to whether or not the
conductor was on top of the caboose at the time of the
accident, but all of the witnesses above mentioned as testi-
fying for appellant, either testified that he was on top of
the caboose, or that they heard him calling to the motor-
man to stop the car, and that from the sound of his voice
he appeared to be on the top of the caboose.

On the trial of the cause, counsel for appellee asked
several witnesses whether or not, at and prior to the time in
question, appellant maintained a flagman at Hickory cross-
ing.    These questions were objected to by appellant on the
ground that proper foundation for the same had not been
laid, but the objections were overruled by the court, and
the questions were answered in the negative.    The ruling
of the court was excepted to by appellant and is now insisted
upon as error.

We are of opinion that the ruling of the court in this particular was proper, notwithstanding the fact there was no averment in the declaration of negligence in failing to station a flagman at the street crossing in question, and the further fact that there was no proof of any ordinance of the city requiring such a flagman. In the case of N. Y., C. & St. L. R. R. Co. v. Luebeck, 157 Ill. 595, under similar circumstances, an instruction was sustained which had been given for the plaintiff, to the effect that evidence as to whether there was a flagman at the crossing should be considered by the jury, "not as tending of itself to establish negligence, but solely for the purpose of showing the general condition of things at the locality of such crossing at the time of the alleged injury, so as to assist the jury to determine, from all the circumstances and evidence in the case, and under the instructions of the court, whether the defendant was guilty of negligence, as charged by the plaintiff in his declaration." In the course of the opinion it was said, referring to the admission of evidence that there were no gates or flagman at the crossing in question, "under the rule announced in Chicago & Iowa R. R. Co. v. Lane, 130 Ill. 116, this was competent in connection with proof of the condition of things in respect to travel and otherwise in that locality, and on the question of the care and caution on the part of appellant in running its train in accord with public safety."

In the case of McGrath v. N. Y. C. & H. R. R. Co., 63 N. Y. 522, it was said:

"The fact (of the presence or absence of a flagman) may be proved as one of the circumstances under which the train was moved, and by which the degree of care requisite in its handling and running may be affected, so that the question never is whether there should have been a flagman, or one ought to have been stationed at the crossing, but whether, in view of his presence or absence, the train was moved with prudence or negligence."

We therefore hold that, in view of the facts proved as to the public use of the street, it was proper to show the exact condition of things at the crossing, including the fact that

no flagman was stationed there, not to establish negligence in not keeping a flagman at that point, but to enable the jury to determine what precautions due care required of the trainmen when backing the train upon the crossing. In our opinion, the questions as to whether appellant was guilty of negligence as charged, and if so, whether its act was the efficient and proximate cause of the injury complained of, were, under the evidence in the case, very close indeed. Under such circumstances, it is very necessary, in order that exact justice should be done, that the jury should try the case, as between plaintiff and defendant, upon its merits, and without prejudice growing out of circumstances connected with other parties.

In the case at bar the deceased, who had started out for a pleasure ride upon a street car, was deprived of his life at a moment's warning without any negligence or fault on his part whatever. The moving agent in the tragedy was the motorman, who, in utter disregard of the rules of his company and of the dictates of common prudence, permitted his car to rush onto a railroad crossing without stopping at a proper distance before the crossing to investigate the possibility of danger, and with his back turned toward the point from which danger must come. Under such circumstances, the jurors would have been less than human if they had not been influenced by a feeling of prejudice against the motorman and his company, and by a feeling of sympathy for the wife of the man whose life had been so needlessly sacrificed.

The street railway company was continued as a defendant in the case until all the evidence had been heard and the case was ready for argument. During the whole trial appellee had had the benefit of such prejudice as may have been engendered in the minds of the jury against the street railway company. It would not be wonderful if, at the conclusion of the proceeding, it had become impossible for the jury to consider the case against appellant entirely free from and unaffected by any prejudice which may have existed among them, against the other defendant.

While we do not intend to express any opinion as to the right of the appellee to recover upon the whole case, yet we are of opinion that appellant, by reason of the facts above stated, did not have such a trial as it was entitled to under the law, and that the case should be submitted to another jury. The judgment in this case will therefore be reversed and the cause remanded for another trial. Reversed and remanded.

MR. JUSTICE DIBELL, dissenting.

There was evidence tending to show that when appellant backed its train into Hickory street the caboose and one or two freight cars attached to it were not coupled to the rest of the train, and were therefore not under the control of the brakemen (who were near the head of the train), nor of the engineer. No employe of appellant was at or near the brakes on said caboose, and one or two freight cars attached to it. If the caboose and one or two freight cars next to it were thus "kicked" into the street and upon the street car track, with no one to control or stop them, then appellant was, in my judgment, liable in this action. There was also testimony tending to show said cars were not thus detached, but had been coupled to the rest of the train before it was backed up. I differ from the majority of the court as to the weight of the testimony upon this subject. Considering the place where each witness was at the time the noise of the collision was heard, his distance from the collision, the quickness with which he got to the wreck, his testimony as to what he then saw as to whether the rear cars were or were not then coupled to the rest of the train, the inability of several of the trainmen to testify positively that the rear cars were uncoupled by the train hands shortly after the collision, and various concessions made by some of the witnesses on cross-examination, I have been brought to the conclusion that the state of the evidence as to whether the rear cars were thus uncoupled when they were driven back upon the street was such that the finding of the jury thereon should not be disturbed.

If appellant and the Streator Railway Company were each legally responsible for the death of appellee's intestate, then appellee had the right to sue each, either separately or jointly. If this suit had been originally brought against appellant alone, substantially all the evidence which was introduced at the trial below would have been competent, and must have created just the same feeling toward appellant in the minds of the jury that it did create at the trial now under review, no less and no more. I am unable, therefore, to see how the presence of the Streator Railway Company as a co-defendant till near the close of the trial, could have prejudiced appellant.